**ANNA O. AREA**
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**100 F Street NE**
**Washington, DC 20549**
**Telephone: (202) 551-6417**
**Email: areaa@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MEYER GLOBAL MANAGEMENT, LLC, and OWEN E. H. MEYER,**<br><br>**Defendants.** | **<u>COMPLAINT</u>**<br><br>**No. ___________**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Meyer Global Management LLC ("MGM") and Owen E. H. Meyer ("Meyer") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1. This civil enforcement action involves a series of fraudulent schemes in which investment advisers Meyer and his company MGM breached their fiduciary duties to client funds and defrauded investors, including by misappropriating investor money held in private funds that Defendants controlled, misleading investors into believing that their investments were secure or

increasing in value, and using fund capital to support Meyer's lifestyle and sustain his fraudulent business.

2. From at least 2019 to 2024, MGM and Meyer raised at least $18,500,000 from nearly 100 investors by selling interests in MGM-managed funds that held interests in pre-IPO securities, including Space Exploration Technologies Corp. ("SpaceX") and OpenAI, Inc. ("OpenAI").

3. In at least five distinct instances, from December 2021 to the present, (the "Relevant Period"), MGM and Meyer engaged in fraudulent schemes in which they misused client assets in violation of their fiduciary duties to the funds they advised and lied to investors in those funds.

4. In three such schemes, Defendants misappropriated a total of at least $1,270,000 of client fund capital to pay for Meyer's lifestyle, personal investments, and investments on behalf of other MGM-advised funds. Defendants concealed such activities from their client funds and falsely assured investors that their investment capital was "safe," "secure," or increasing in value when in fact it had been dissipated. In one of these schemes, Defendants skimmed from proceeds that should have been distributed to client funds and investors, then effectively held investor proceeds hostage unless investors agreed to accept less than they were entitled to receive as a return on their investments and agreed not to sue MGM and Meyer.

5. In a fourth scheme, Defendants essentially used investor funds as an undisclosed, months-long $85,950 interest-free loan from their client Fund in violation of their fiduciary duties as an investment adviser to support Meyer's lifestyle, including spending over $18,000 of Fund capital in a single night for his personal entertainment at a strip club.

6. In a fifth scheme, Defendants breached their fiduciary duties to a client fund that held SpaceX assets by failing to pay a capital call in 2024, failing to respond to multiple notices of default, and failing to participate in legal proceedings that ultimately led to the forfeiture of the entirety of the fund's assets, in which investors had invested nearly $3,000,000. After having lost the fund's only assets, Defendants told investors to "stay tuned" for information about distributions of SpaceX shares, misleading them into believing that they would receive a return on their investments.

7. Throughout these five schemes, MGM and Meyer deceived and defrauded their client funds and investors, put their own interests above the interests of the funds they advised, and failed to exercise reasonable care or act in the best interests of their client funds in breach of their fiduciary duties.

## VIOLATIONS AND RELIEF SOUGHT

8. As a result of the conduct alleged herein, Defendants have violated, and unless restrained and enjoined will continue to violate Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(1), (2), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8)].

9. The Commission seeks a final judgment: (a) permanently enjoining Defendants from further violating the federal securities laws as alleged in this Complaint; (b) entering a permanent conduct-based injunction restraining and enjoining Meyer from, directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser; (c) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged herein and to pay pre-judgment interest thereon, pursuant to Sections 21(d)(5) and 21(d)(7) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

(d) ordering Defendants to pay civil money penalties pursuant to Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and (e) granting any other and further relief the Court may deem just and proper.

**JURISDICTION AND VENUE**

10. This Court has jurisdiction over this action pursuant to Sections 209(d), 209(e)(1), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) and 80b-14].

11. MGM and Meyer have, directly or indirectly, made use of the means or instrumentalities of interstate commerce and/or the mails, including the use of email, the internet, and telephone in connection with the illegal transactions, acts, practices, and courses of business alleged in this Complaint.

12. Venue is proper in this district pursuant to Section 214 of the Advisers Act [15 U.S.C. § 80b-14]. During the time period of the allegations in this Complaint, MGM's principal place of business was in the Southern District of New York. Additionally, Defendants routinely transacted business in the Southern District of New York, and certain of the acts, practices, transactions, and course of business alleged in this Complaint occurred within this District.

**DEFENDANTS**

13. **MGM** is a Delaware limited liability company with its principal place of business in New York. MGM is wholly owned and controlled by Meyer. Beginning in 2022 and annually thereafter, MGM claimed exempt reporting adviser status on its Forms ADV filed with the Commission. MGM is the investment adviser to approximately 16 affiliated private funds, all of which are pooled investment vehicles formed to raise money from investors and acquire assets in a single private portfolio company. MGM reported at most $34,331,748 in regulatory assets

under management between 2022 and 2025. Most recently, in 2026, MGM reported $25,337,682 in regulatory assets under management.

14. **Meyer**, age 35, resides in Setauket, New York. Meyer is the founder and Chief Executive Officer of MGM and the company's sole owner, sole managing member, and sole full-time employee. Meyer oversees all investment decision-making, fund management, and investor relations activities for MGM. Meyer also controls several MGM-affiliated entities, including Meyer Equity, LLC ("Meyer Equity") and Meyer Global GP, LLC ("Meyer Global GP"), which serve as the general partners, sponsors, and/or managing members for MGM's client funds.

## RELATED PARTIES

15. **Meyer Equity, LLC** ("Meyer Equity") is a Delaware LLC. Meyer Equity is the General Partner for most of the investment funds created and controlled by Meyer and MGM. Meyer and MGM are each 50% owners of Meyer Equity. Meyer controls MGM and Meyer Equity.

16. **Meyer Global GP, LLC** ("Meyer Global GP") is a Delaware limited liability company. Meyer Global GP is the general partner and sponsor for the private fund Meyer Global Partners I, LLC. Meyer controls Meyer Global GP.

17. **Meyer Global Partners, LLC**, is a Delaware limited liability company. Meyer formed Global Partners, LLC as a "master fund" to centralize assets from certain "series funds" he advised. The first such series fund was the private fund Meyer Global Partners I, LLC. Meyer controls Meyer Global Partners, LLC.

18. **Meyer Global Partners I, LLC** ("MGP I") is a private fund and a Delaware LLC within the "master fund" Meyer Global Partners, LLC. Meyer Global GP and MGM are the General Partner and Manager of the fund respectively.

19. **Meyer Equity Starship I, LLC** ("Starship I") is a private fund and a Delaware LLC. Meyer Equity and MGM are the General Partner and Manager of the fund respectively.

20. **Meyer Equity Starship IV, LLC** ("Starship IV") is a private fund and a New York LLC. Meyer Equity and MGM are the General Partner and Manager of the fund respectively.

21. **Oikoi Network Partners, LP – Starship V** ("Starship V") is a private fund and a Delaware limited partnership. Meyer Equity and MGM are the General Partner and Manager of the fund respectively.

22. **Oikoi Network Partners, LP – Starship VI** ("Starship VI") is a private fund and a Delaware limited partnership. Meyer Equity and MGM are the General Partner and Manager of the fund respectively.

23. **Meyer Equity Starship VII, LLC** ("Starship VII") is a private fund and a Delaware LLC. Meyer Equity and MGM are the General Partner and Manager of the fund respectively.

24. **Meyer Equity Starship X, LLC** ("Starship X") is a private fund and a New York LLC. Meyer Equity and MGM are the General Partner and Manager of the fund respectively.

# FACTS

## I. Defendants and the Funds They Created

### A. Defendants Offered and Sold Securities

25. Starting as early as November 2019, Meyer raised capital from investors to invest in interests in private funds that own shares of pre-IPO companies, including SpaceX and OpenAI, via special purpose vehicles set up for that use, beginning with Starship I.

26. To raise capital for these funds, Meyer would find and solicit investors through personal relationships, word of mouth referrals, and business connections. In some instances, Meyer found investors through an online marketplace for pre-IPO stock. He would also occasionally speak to and solicit small groups of investors.

27. MGM and Meyer continued raising capital from investors throughout the Relevant Period, eventually setting up approximately 16 affiliated private funds (the "Funds"), each designed to acquire interests in a single pre-IPO company. Instead of owning shares of portfolio companies directly, Funds typically invested in funds managed by a third-party adviser, which either held shares directly or invested in yet another third-party fund. Defendants invested the assets of the majority of these private Funds in interests in SpaceX, but also invested a few of the Funds in interests in other pre-IPO companies, including Neuralink Corp., Destinus S.A. ("Destinus"), and Relativity Space, Inc.

28. In one of these Funds, MGM and Meyer raised capital from investors to invest in privately held shares of OpenAI and online casino operator PlayStar Gaming Group AB ("Playstar"). As detailed below, however, ultimately Defendants did not acquire shares in those companies.

29. Investors in each Fund signed governing documents that laid out the permissible uses for investment capital, which were limited to investment in the underlying portfolio company, payment of management fees, and payment of operating expenses relating to the Fund.

30. Investors were limited partners of each Fund and had no role in management or control of the Fund.

**B. Defendants Were Investment Advisers**

31. The governing documents for each Fund designated Meyer, or one of the entities he owned and controlled, as making investment decisions on behalf of each Fund. In the Forms ADV that MGM filed with the Commission annually from 2022 to 2026, MGM listed each Fund at issue here as a private fund it advised. Governing Fund documents provided that MGM would receive management fees for "advisory and related obligations." Meyer and MGM received substantial compensation, including in the form of management fees and carried interest, for their services to the Funds.

32. Accordingly, during the Relevant Period, Defendants acted as investment advisers to the Funds within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because they were persons who, for compensation, engaged in the business of advising others, both directly and through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

33. Investment advisers, such as Defendants, owe a fiduciary duty to their client Funds, which includes a duty of care and a duty of loyalty. The duty of care requires the investment adviser to provide investment advice in the best interest of its client, based on the client's objectives. The duty of loyalty requires an investment adviser to eliminate or make full and fair disclosure of all conflicts of interest that might incline an investment adviser—

consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict.

34. As discussed below, in at least five instances, Defendants failed to adhere to their fiduciary duties, and in at least three instances Defendants misappropriated significant amounts of client Fund money to pay for expenses unrelated to the specific Fund to which they belonged, as well as to pay for Meyer's lifestyle.

## II. Defendants' Scheme to Misappropriate Starship VI Fund Capital and Defraud Its Investors

35. In the first scheme, in February and March 2021, MGM and Meyer raised approximately $1.1 million from 13 individual retail investors in the Starship VI Fund for the purpose of investing in interests in SpaceX. The Series Agreement for Starship VI stated, "The primary purpose of the fund is to provide the [investors] with the opportunity to realize long-term appreciation generally investments [sic] in the securities of [SpaceX]."

36. MGM records show that it took approximately $85,000 in management fees upfront from Starship VI capital.

### A. Defendants' Lies to Starship VI Investors about Investment Status

37. In mid-March, 2021, Meyer signed a letter agreement with the President of Company A under which Starship VI would purchase Company A's interest in Fund X, which in turn held shares of SpaceX. Fund X was sponsored by a third party unrelated to Company A or MGM. The agreement was subject to the operating agreement of Fund X, which required a representative of Fund X to approve any transfer of interests in Fund X. Indeed, the letter agreement had a signature line for a representative of Fund X to accept the transaction. Pursuant to the agreement, Starship VI paid $1,035,000 to Company A.

38. After Meyer and the managing member of Company A signed the agreement, Meyer emailed a Fund X representative and requested the "standard Transfer Agreement from [Fund X]" to authorize the transfer.

39. However, in an email to Meyer and Company A's President, dated April 2, 2021, a representative for Fund X stated, "[W]e're unable to arrange a transfer here." Thus, Defendants were unable to obtain interests in Fund X or, in turn, SpaceX shares from Fund X.

40. Nearly three months after receiving Fund X's email rejecting the sale from Company A to Starship VI, on June 29, 2021, Meyer wrote to Starship VI investors in an email with the subject line "Starship VI - Closed!" and falsely told them that the Fund's investment "has been closed with [Fund X]."

41. On July 9, 2021, Meyer Equity entered into a "Shares Transfer Agreement" with one Starship VI investor in which Meyer Equity purportedly purchased the 100 shares of SpaceX that the investor believed he owned through Starship VI for the price of $49,850. Meyer executed this Agreement on behalf of Meyer Equity, despite knowing that Fund X had refused to transfer any SpaceX shares to Starship VI.

42. On November 17, 2021, Meyer texted Company A's managing member to complain that the deal for Starship VI had not been finalized. Specifically, Meyer texted, "I've been very nice to you. Please do me a favor and close starship VI. It's almost December."

43. Next, Meyer began to repeatedly demand repayment relating to Starship VI. On November 22, 2021, Meyer texted the managing member of Company A, "Why did it take 8 months?" and "Now there is no more time left. I hope you have my money."

44. The managing member of Company A responded that he needed time, would repay the full Starship VI investment amount eventually, and would likely start with something

less than $500,000. Meyer responded, “First batch should be at least 50% and next batch should be thereafter.”

45. Consistent with Meyer’s text message instructions to wire back 50% of Starship VI’s investment, Company A’s managing member wired $500,000 of Starship VI’s investment capital from Company A back to Meyer Equity with a memo description of “FURTHER CREDIT TO STARSHIP VI CAPITAL RETURN” on December 16, 2021.

46. One year later, on December 16, 2022, Company A wired an additional $100,000 to Meyer Equity with the same memo line used in 2021: “FURTHER CREDIT TO STARSHIP VI CAPITAL RETURN.” In total, Company A’s managing member returned at least $600,000 between December 2021 and December 2022 to a bank account for Meyer Equity.

47. In the first quarter of 2022, despite knowing that Starship VI failed to acquire Company A’s interest in Fund X and that Company A had returned approximately half of Starship VI’s investment capital in December 2021, MGM and Meyer sent Starship VI investors updates falsely indicating that their investments had appreciated in value.

48. Similarly, after Meyer Equity received the second repayment of Starship VI investment capital from Company A in December 2022, Defendants sent investors statements for January 1, 2023, to February 16, 2023, showing unrealized gains and indicating that the “Account statement reflects the latest tender offer round for SpaceX at $770/share (pre-split 10-1).” With these materially false and misleading statements, Defendants created the false impression that Starship VI did in fact hold interests in SpaceX that were appreciating in value.

**B. <u>Defendants Misappropriated from the Starship VI Fund</u>**

49. Meanwhile, Defendants used Starship VI's capital for their own benefit. Specifically, in January 2022, Defendants used the $500,000 returned to Meyer Equity from Company A in December 2021 as follows:

- $70,000 (approximately): investment on behalf of Meyer Equity in Destinus, a portfolio company for a different MGM-managed Fund;
- $100,000: Meyer's personal investment in an exotic car company;
- $105,000: payment to MGM that was not used to invest in SpaceX; and
- $220,000: payments to Meyer's personal bank account ("Personal Account").

50. Similarly, in December 2022, the same day that Company A wired Meyer Equity $100,000 of Starship VI's capital, Defendants wired $99,000 of this money from the Meyer Equity account to Meyer's Personal Account and Meyer used approximately $31,000 of this money to finalize a buyout of an investor's shares in another MGM Fund.

51. Additionally, bank records show that Defendants spent or transferred all of the returned Starship VI capital by early January 2023. None of these payments were to Starship VI investors, however.

52. Meyer Equity itself made a $52,839 net investment as part of the $1,035,000 sent to Company A, *i.e.*, Meyer Equity funded about 5% of the total Starship VI investment. Thus, at most, Meyer Equity was entitled to keep 5% of the $600,000 returned to Starship VI, or $30,000. Defendants misappropriated the remaining $570,000.

53. Even though MGM and Meyer had received approximately half of Starship VI's capital back from Company A by the end of 2022 and had not successfully purchased any interests in SpaceX for Starship VI, Defendants continued to send investors updates indicating that their full investments had appreciated in value, including as recently as September 2024.

54. By misrepresenting to Starship VI investors their actual uses of investor capital, by misrepresenting to investors that Starship VI owned SpaceX assets when it did not, and by misappropriating hundreds of thousands of dollars of Starship VI capital in breach of their fiduciary duties to the client Fund Starship VI, Defendants, knowingly, recklessly, or at a minimum, negligently, engaged in a scheme to defraud and deceive the Starship VI and its investors.

## III. Defendants' Scheme to Misuse and Misappropriate Meyer Global Partners I Fund Capital and Defraud Investors

### A. MGP I (Playstar) – 2023

55. By 2023, Defendants began a second scheme to defraud a client Fund and its investors seeking to invest in pre-IPO shares.

56. In early 2023, Defendants established MGP I to invest in pre-IPO shares of Playstar, an online casino and gambling company.

57. The investor subscription documents for this first iteration of MGP I described it as a fund "Formed for the Sole Purpose of Investing In: Playstar[.]" For clarity, for the year 2023, the MGP I Fund is referred to herein as "MGP I (Playstar)." The MGP I (Playstar) Fund agreement permitted MGM to take a one-time management fee equal to "one percent (1%) annually of all capital contributions paid upfront for five (5) [sic], or 5%." It also included an expense provision which stated that the "Fund shall bear all third party operating expenses incurred in connection with the organization, syndication, formation, management, operations, and liquidation of the Fund . . . ."

58. Between March 27 and March 30, 2023, three investors wired a total of $85,950 to a bank account in the name of Meyer Global Partners, LLC, the master Fund into which

MGP I (Playstar) was intended to feed. Meyer used this account (the "Playstar Account") for the MGP I (Playstar) Fund.

59. Despite the representations in the Fund agreement, MGM and Meyer spent nearly this entire amount on expenses unrelated to investing in Playstar or MGP I (Playstar) operating expenses permitted under the Fund agreement. For example, on April 12, 2023 and April 24, 2023, Defendants wired $35,000 and $30,000, respectively, from the Playstar Account to Meyer's Personal Account, and, then on the same days, used the money to pay legal fees unrelated to MGP I (Playstar).

60. Meyer also used MGP I (Playstar)'s assets to pay for his personal lifestyle. For example, on April 20, 2023, at 4:41 AM, Meyer attempted to pay $4,415.56 to a strip club using a debit card associated with Meyer Global Partners, but it declined twice. At 4:43 AM, Meyer transferred $10,000 from the Playstar Account, which at this point contained solely investor money, to the Meyer Global Partners account, and then paid the strip club $4,415.56 at 4:44 AM and an additional $3,653.25 at 5:30 AM. Receipts from the strip club indicate that the expenses were for drinks and entertainment room rental fees, as well as the name of Meyer's server that evening.

61. On the same date, April 20, 2023, between 2:20 AM and 5:00 AM, Meyer transferred a total of $10,000 directly from the Playstar Account to the manager of the strip club. Memo lines on these payments include "movie tickets and theatre performance," "opera," and "for [name of strip club server]." The club manager testified that Meyer visited the club alone, not with any business associates or friends, and that Meyer's payments to him personally may have been because Meyer was having difficulties paying with his own credit card, or as gratuity to him as manager. The club manager testified that he personally had no involvement with

MGM or Playstar and the payments he received from Meyer were not related to MGP I (Playstar) or MGM.

62. When asked about this $10,000 transferred directly from the Playstar Account to the manager of the strip club during sworn testimony, Meyer invoked his Fifth Amendment privilege against self-incrimination.

63. From May 3, 2023, until August 3, 2023, the Playstar Account had a $0 balance.

64. Nevertheless, in furtherance of their scheme, on July 5, 2023, Defendants informed the largest investor in MGP I (Playstar) that the Playstar investment fell through, but "your capital is safe in the fund."

65. Again, on July 8, 2023, when the Playstar Account balance was still $0, Meyer texted the same investor saying, "I assure you your invested capital is safe" and "the fund is unwinding and the capital is going to be returned to all investors." When the investor pressed Meyer as to when he would get his money back, Meyer promised to return the capital "this coming week." However, Defendants did not return capital to all of the investors in MGP I (Playstar), including this largest investor, until December 28, 2023.

66. Ultimately, MGP I (Playstar) was unable to acquire any pre-IPO shares of Playstar.

67. As a result, Defendants essentially used investor funds as an undisclosed, months-long $85,950 interest-free loan from the MGP I (Playstar) Fund in violation of their fiduciary duties as investment advisers.

68. By misrepresenting to MGP I (Playstar) investors that their capital was "safe" in the MGP I (Playstar) Fund when it was not, and by misusing thousands of dollars of Fund capital as an undisclosed, interest-free loan in violation of their fiduciary duties to the client Fund MGP

I (Playstar), Defendants, knowingly, recklessly, or at a minimum, negligently, engaged in a scheme to defraud and deceive MGP I (Playstar) and its investors.

**B. <u>MGP I (OpenAI) – 2024</u>**

69. After MGP I was unable to acquire Playstar assets in 2023, in March 2024, MGM and Meyer repurposed MGP I to invest in interests in OpenAI. For clarity, from March 2024 forward, the MGP I Fund is referred to herein as "MGP I (OpenAI)." Defendants used this MGP I (OpenAI) Fund for their third scheme.

70. On March 20, 2024, Defendants emailed prospective investors about the "OpenAI - Investment Opportunity (Closing Soon)." In the email, Defendants provided details about the investment opportunity, including, among other things, that "[t]he Fund charges a 5% upfront one-time; 20% carried interest."

71. Investor subscription documents described MGP I (OpenAI) as a Fund "Formed for the Sole Purpose of Investing In: Open AI[.]" The MGP I (OpenAI) Fund agreement permitted MGM to take a one-time management fee equal to "one percent (1%) annually of all capital contributions paid upfront for five (5) [sic], or 5%." It also included an expense provision stating that the "[t]he Fund shall bear all third party operating expenses incurred in connection with the organization, syndication, formation, management, operations, and liquidation of the Fund[.]"

72. In addition to these Fund documents, one investor signed a side letter, dated March 24, 2024. The letter required MGP I (Playstar)'s general partner, Meyer Global GP, to provide the investor with notice within 10 business days of "[c]onfirmation of success or failure of the transaction to acquire the underlying Units of OpenAI." Further, under the side letter, if the OpenAI acquisition failed, Meyer Global GP was required to "notify the Investor

immediately and return all of the Capital Contribution to the Investor until the Investor has received 100.0% of the initial capital." Meyer wholly owned and controlled Meyer Global GP.

73. According to Meyer's own sworn testimony, the deal to acquire OpenAI assets fell through in March of 2024.

74. Despite knowing that the deal had fallen through, Defendants did not inform investors of this development for approximately six months. Defendants also failed to "immediately" inform the investor whose side letter required such notification.

75. Between April 8 and April 18, 2024, six investors wired a total of $1,097,500 to a different account in the name of Meyer Global Partners, LLC, for investment in MGP I (OpenAI) (the "OpenAI Account"). At least five of the Fund's six investors signed Fund documents when wiring their money to the OpenAI Account. According to Fund documents, MGM could collect 5%, or approximately $54,000, in management fees related to this client Fund.

76. Meanwhile, between April 9, 2024 and July 1, 2024, through a series of transactions with memo lines referencing management fees, Defendants wired from the OpenAI Account to Meyer's Personal Account a net of approximately $168,000, *i.e.*, approximately $114,000 more than the amount of management fees agreed to by investors in the MGP I (OpenAI) Fund documents.

77. In other words, Defendants wired Meyer over three (3) times the amount of management fees investors and the Fund had agreed to pay.

78. Meyer spent at least some of this money on expenses that were not related to OpenAI, including:

- $1,000 in landscaping for Meyer's personal residence on June 27, 2024; and
- $15,000 to a law firm for legal expenses for an individual facing drug-related charges in New York on July 8, 2024.

79. While misappropriating money from MGP I (Open AI), MGM and Meyer made false and misleading representations to certain investors that their money was safe and being used for OpenAI investing.

80. For example, on July 19, 2024, in furtherance of his scheme, Defendants emailed at least four of the six MGP I (OpenAI) investors that Meyer had been ill and had recently hired an administrative assistant, but "All portfolio holdings have been diligently managed in my absence; your investments remain secure."

81. On July 22, 2024, at Meyer's direction, MGM's administrative assistant informed an investor:

> Regarding your OpenAI investment, the transaction has not been finalized. We expect it to be closed within the next two weeks; you will receive your investment records upon completion. If for some reason the transaction falls through, your funds will be returned to you.

82. Finally, around October 2024, MGM and Meyer informed investors that MGP I (OpenAI) was unable to acquire OpenAI shares as originally planned and offered investors a new opportunity to invest in OpenAI at a higher valuation or to have their investment capital (less management fees) returned to them.

83. Even this offer was misleading because at the time, MGP I (OpenAI) had insufficient funds in its account with which to reinvest or repay all investors. Thus, once again, Defendants misled investors into believing their money was "secure" even though the Fund was missing approximately $130,000, at least $16,000 of which Meyer had spent on expenses unrelated to MGP I (OpenAI), as detailed above.

84. Meanwhile, beginning on December 25, 2024, through March 19, 2025, Defendants transferred an additional $47,000 from the OpenAI Account to Meyer's Personal Account with memo lines that referenced administrative fees.

85. Only three of the six MGP I (OpenAI) investors received all or substantially all of their investments back.

86. Only one of the other three MGP I (OpenAI) investors—who did not get his money back—accepted Defendants' offer to keep his original $100,000 investment capital in the Fund to invest in OpenAI at the higher valuation. This investor opted to reinvest in January 2025. By the end of January 2025, however, the OpenAI Account balance was reduced to only approximately $33,000. Yet, as of at least July 31, 2025, Defendants had still never acquired any interests in OpenAI for MGP I (OpenAI).

87. In order to repay the three unreimbursed investors at least their initial capital minus management fees in light of the Fund's failure to obtain interests in Open AI, MGP I (OpenAI) would have needed approximately $195,000. However, by March 19, 2025, only about $15,600 of the original balance of the OpenAI Account remained, far below the $195,000 necessary to repay the remaining three investors. In fact, as of the date of this filing, the balance remains at most approximately $15,600.

88. By misrepresenting to MGP I (OpenAI) investors their actual uses of investor capital, by misrepresenting to investors that their capital was "secure" in the MGP I (OpenAI) Fund when it was not, and by misappropriating thousands of dollars of Fund capital in violation of their fiduciary duties to the client Fund MGP I (OpenAI), Defendants, knowingly, recklessly, or at a minimum, negligently, engaged in a scheme to defraud and deceive MGP I (OpenAI) and its investors.

## IV. Defendants' Material Misstatements and Omissions to the Liquidated SpaceX Funds Investors and Misappropriation of Investor Funds

89. In a fourth fraudulent scheme, Defendants misappropriated client Fund money in 2025 from a series of Funds they had formed in late 2020 through 2021.

### A. Background of the Liquidated SpaceX Funds and State Court Litigation

90. Through three MGM client Funds—Starship IV, Starship V, and Starship VII (collectively, the "Liquidated SpaceX Funds")—Defendants raised approximately $5,600,000 from approximately 45 investors to invest in SpaceX.

91. Defendants invested each of the Liquidated SpaceX Funds, in turn, in funds managed by Investment Adviser A that held SpaceX assets. Meyer Equity was the manager of Starship IV and general partner for Starship V and Starship VII. Meyer and MGM are each 50% owners of Meyer Equity.

92. Fund documents for the Liquidated SpaceX Funds stated that Fund capital would be used to invest in SpaceX with a portion deducted upfront for management fees. For Starship IV the management fee was 5% upfront; for Starship V the management fee was 2% upfront; and for Starship VII the management fee was 10% paid within five years. Upon a liquidity event, Meyer Equity was entitled to up to 6% carried interest on the Fund's income.

93. Additionally, capital of the Liquidated SpaceX Funds could also be used to pay for third-party operating expenses incurred in connection with the organization, syndication, formation/start-up, management, operations, and liquidation of the respective Liquidated SpaceX Fund, whether incurred directly by that Fund or attributed to that Fund.

94. In early 2025, MGM and Meyer entered into a court-approved settlement agreement with Investment Adviser B to resolve civil litigation claims filed by Investment Adviser B in New York state court in 2023 (the "Settlement Agreement"). This litigation arose

after Meyer and MGM allegedly breached an agreement with Investment Adviser B (the "Underlying Agreement") and thereafter allegedly slandered Investment Adviser B. The Underlying Agreement and the Settlement Agreement with Investment Adviser B were unrelated to the Liquidated SpaceX Funds.

95. Under the Settlement Agreement, MGM and Meyer were required to transfer 100% of their own investments in Funds advised by MGM to Investment Adviser B and, on a going-forward basis, MGM and Meyer agreed to pay to Investment Adviser B 50% of all management fees and 70% of all carried interest due to MGM. As a result, all assets from new investments or liquidity events were to be deposited into an escrow account. Then, a third-party receiver (the "Receiver") would apportion 50% of any management fees and/or 70% of any carried interest due to MGM under the Fund agreements to Investment Adviser B with the remaining amounts of management fees and carried interest distributed to MGM, until Investment Adviser B had received a specified cash settlement amount.

96. By its terms, the Settlement Agreement did not affect, nor did Investment Adviser B seek to take, any client Fund or investor assets. Additionally, the Settlement Agreement did not affect MGM's role as manager of Fund operations, including its responsibility for distributing client Fund assets to investors in a liquidity event.

97. Investment Adviser A terminated and liquidated the Liquidated SpaceX Funds' investments in third-party funds advised by Investment Adviser A in or around January 2025. Thereafter, Defendants provided the Receiver a worksheet they had created that purported to calculate the total amount of carried interest that MGM was entitled to receive from the liquidity events, with 70% apportioned to Investment Adviser B and 30% to MGM in accordance with the

Settlement Agreement. Defendants' spreadsheet also detailed how much money should be distributed to the Liquidated SpaceX Funds and to each investor in those Funds.

98. According to this worksheet, Meyer was entitled to $82,081 in carried interest, and $13,832,159 was due to the Liquidated SpaceX Funds, which would in turn distribute it to the underlying investors in those Funds.

99. Accordingly, on October 17, 2025, the Receiver wired $82,081 to Meyer's Personal Account for Meyer's share of carried interest. Separately, in mid-November 2025, the Receiver wired $13,829,158.01 to Meyer Equity's bank account, all of which should have been distributed to the Liquidated SpaceX Funds and their underlying investors.

100. Instead, Defendants transferred only approximately $13,142,522 to investors in the Liquidated SpaceX Funds from the Meyer Equity bank account. Of the remaining $686,636, Defendants (1) transferred $50,000 directly to an individual who had invested in an unrelated Fund advised by MGM; and (2) transferred about $636,406 to Meyer's Personal Account in a series of transactions between November 2025 and July 2026.

### B. Defendants Misappropriated Funds Meant for the Liquidated SpaceX Funds and Their Underlying Investors

101. In violation of their fiduciary duties as Investment Advisers, MGM and Meyer failed to act in their client Funds' best interests and misappropriated a total of at least $686,000 of the Liquidated SpaceX Funds' money when they transferred approximately $636,000 of that money to Meyer's Personal Account and $50,000 to an individual who was not a Liquidated SpaceX Funds investor.

102. By early February 2026, Defendants had transferred approximately $512,000 to Meyer's Personal Account, and Meyer had spent or transferred out of his Personal Account

approximately $501,000 of that total. None of these transfers were to the Liquidated SpaceX Funds or to any of their underlying investors.

103. Further, Meyer spent thousands of dollars of the money he transferred to himself on expenses unrelated to the Liquidated SpaceX Funds and to pay for his own lifestyle or investments unrelated to the Liquidated Funds. For example, in November 2025, Meyer wired $23,000 to an individual with a memo line referencing “Destinus Funding Investments.” Destinus is a pre-IPO company in which another MGM-managed Fund invested; the Liquidated SpaceX Funds did not invest in Destinus.

104. From November 2025 through January 2026, Meyer also sent six wires totaling $40,000 to a different individual with memo lines that referred to return of debt, capital, funds, or second wire. This individual was not an investor in the Liquidated SpaceX Funds, however, and should not have received money from the Liquidated SpaceX Funds.

105. Similarly, in December 2025, Meyer paid $86,000 to his father with memo lines indicating “Oikoi Network Fund – Return of Funds” and “real estate and other fees/bnf/Oikoi Network Fund – Return of Funds.” Meyer’s father was not an investor in the Liquidated SpaceX Funds, so he also should not have received money from the Liquidated SpaceX Funds.

106. Additionally, between November 2025 and February 2026, Meyer spent thousands of dollars on shopping at Bloomingdale’s and Amazon out of the $636,000 he transferred to his Personal Account from the Liquidated SpaceX Funds.

107. Each of the aforementioned wires and payments described in paragraphs 103 through 106 were funded primarily by money from the Liquidated SpaceX Funds. When counsel for the Commission attempted to question Meyer regarding these expenditures, Meyer

invoked his Fifth Amendment privilege against self-incrimination and refused to sit for testimony.

108. Fund agreements for the Liquidated SpaceX Funds did not permit Fund proceeds to be used on behalf of other Funds or to pay for Meyer's lifestyle. Nor did either the Fund documents or the Settlement Agreement allow Defendants to transfer any portion of the $13,829,158.01 that the Receiver wired to Meyer Equity's bank account in November 2025 to anyone other than the Liquidated SpaceX Funds and their underlying investors.

109. MGM and Meyer then engaged in additional misconduct designed to defraud the Liquidated SpaceX Funds investors. Before wiring any of the distributions from the Liquidated SpaceX Funds to investors, Defendants required investors to sign broad releases purporting to protect Defendants from any liability "arising out of or relating in any manner . . . to the Investment" in the Liquidated SpaceX Funds. These releases required investors to agree to Defendants' calculation of amounts to be distributed as the "sole and authoritative determination of the Investor's final capital account and distribution," meaning Defendants' determination of the final distribution amount due to each investor.

110. In reality, this amount was approximately 5% *less* than what investors should have received according to Meyer's own calculations in the worksheet he provided to the Receiver. Unbeknownst to investors, Meyer had fraudulently manipulated the distribution calculations he provided to investors to give the impression that they were owed 5% less than he had indicated to the Receiver that investors were entitled to receive.

111. By misappropriating hundreds of thousands of dollars of Liquidated SpaceX Funds proceeds in violation of their fiduciary duties to the client Liquidated SpaceX Funds, Defendants, knowingly, recklessly, or at a minimum, negligently engaged in a scheme to defraud

and deceive the Liquidated SpaceX Funds and their investors. By holding hundreds of thousands of dollars of Liquidated SpaceX Funds proceeds hostage until investors agreed to accept less than they were entitled to receive, Defendants, knowingly, recklessly, or at a minimum, negligently engaged in a scheme to defraud and deceive Liquidated SpaceX Funds investors.

## V. Defendants Violated Their Fiduciary Duties to Starship X by Forfeiting Client Fund Assets and Making Material Misrepresentations to Investors

112. Finally, in a fifth scheme during the Relevant Period, Defendants breached their fiduciary duties to client Funds in other ways and again made material misrepresentations to investors.

113. In early 2022, Defendants raised approximately $3,125,000 from three outside investors for MGM Fund Oikoi Network Partners, LP – Starship X ("Starship X"). Starship X's purpose was to acquire pre-IPO interests in SpaceX.

114. Starship X, in an effort to secure interests in pre-IPO SpaceX shares, invested in a third-party fund, Fund Y, which is managed by third-party Investment Adviser C.

115. Specifically, on February 3, 2022, Starship X and Fund Y entered into a series of agreements (the "Fund Y Agreements") whereby Starship X purchased interests in Fund Y to gain exposure to SpaceX shares.

116. Among other things, the Fund Y Agreements required Starship X to pay fees, expenses, and periodic capital calls owed to Fund Y. In general, a capital call is a demand made on behalf of an investment fund to its investors to contribute a certain amount of money, which had previously been committed to the fund by the investors.

117. In this case, Fund Y made periodic capital calls to Starship X, an investor in Fund Y, to cover certain expenses and fees, including annual management fees. Pursuant to the terms

of the Fund Y Agreements, failure to pay these capital calls could result in forfeiture of the investment by Starship X.

118. In fact, Defendants, as the advisers of Starship X, paid capital calls to Fund Y on behalf of Starship X in both 2022 and 2023.

119. But Defendants failed to ensure Starship X paid a capital call notice from Fund Y dated January 3, 2024, for $46,020. As a result, Starship X never paid that capital call.

120. In response to Defendants' failure, Fund Y notified Meyer that Starship X was in default on three separate occasions—February 9, 2024, March 22, 2024, and July 9, 2024.

121. When Defendants failed to respond, representatives for Fund Y filed suit in Florida state court against Starship X on October 1, 2024.

122. Defendants did not file an answer or otherwise respond in court to the litigation filed by Fund Y against Starship X. On November 19, 2024, the Florida court issued a declaratory judgment, which among other things, ceded all of Starship X's interest in SpaceX shares to Fund Y. This left Starship X with zero or nearly zero assets.

123. Defendants violated their fiduciary duties to their client Fund Starship X because, despite Fund Y's multiple demands for payment of the 2024 capital call, Defendants never took any steps to ensure that Starship X would pay, finance, or cure the outstanding amount, placing Starship X's assets at risk of being forfeited to Fund Y, which ultimately occurred. Moreover, Defendants failed to take any steps to defend Starship X's interests in litigation, leading to Starship X defaulting and forfeiting its only SpaceX assets.

124. Additionally, Defendants made material misrepresentations and omitted material information in communications with investors. Defendants did not disclose to Starship X

investors Defendants' failure to have Starship X pay Fund Y's January 3, 2024 capital call. Nor did Defendants disclose to Starship X's investors the existence of the litigation.

125. On October 29, 2024, nearly a month after Fund Y initiated default proceedings, Defendants charged one investor $10,000 in fees to transfer some of his Starship X shares from individual ownership to a family trust. This investor had a 94.1% interest in Starship X and was Starship X's largest investor.

126. Then, in December 2024, after the state court entered default judgment against Starship X, Defendants issued new share certificates for Starship X to this same investor. But during this process, Defendants failed to disclose that the Starship X shares had become worthless because the Fund's SpaceX interests were forfeited to Fund Y.

127. Starship X's largest investor did not learn of the existence of the Florida state court litigation against Starship X, or the forfeiture of the entirety of Starship X's SpaceX interests, until after he engaged counsel to investigate the status of his investments in the Fund due to Defendants' inconsistent and vague communications in December 2025.

128. On June 12, 2026, the day of SpaceX's initial public offering, Defendants emailed investors in their Starship Funds, including Starship X, telling them:

> …This is a dream that many of us have followed for years, and today we have the opportunity to participate in what I believe will be one of the most important companies of our generation.
>
> * * *
>
> …As investors, we now have the opportunity not only to witness this next chapter unfold, but to be part of it. I am incredibly optimistic about the future and grateful to be writing this chapter alongside all of you.

129. Defendants closed the June 12, 2026 email to investors by telling them to "stay tuned for further updates as to your distribution of shares."

130. Defendants' statements were false and misleading because Starship X did not hold any interests in SpaceX shares that could be distributed in June 2026. Defendants' failure to take any steps to respond to Fund Y's multiple notices of default or to defend Starship X's interests in the state court litigation caused Starship X to forfeit all of its SpaceX interests through that litigation.

131. All investors in Starship X lost the entirety of their investments due to Defendants' inaction and breaches of their fiduciary duties to their client Fund Starship X.

132. By failing to ensure that Starship X paid Fund Y's January 2024 capital call, to take any steps to respond to Fund Y's notices of default, or to defend Starship X's interests in litigation in breach of their fiduciary duties to client Fund Starship X, by failing to disclose to investors the forfeiture of Starship X's assets, and by making misleading representations to investors regarding the status of their investments, Defendants, knowingly, recklessly, or at a minimum, negligently, engaged in a scheme to defraud and deceive Starship X and its investors.

## FIRST CLAIM FOR RELIEF

### Violations of Sections 206(1) of the Advisers Act
### (All Defendants)

133. The Commission realleges and incorporates by reference paragraphs 1 through 132 above.

134. At all relevant times, MGM and Meyer were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11). In the Relevant Period, MGM and Meyer were in the business of providing investment advice concerning securities for compensation.

135. By engaging in the conduct described above, MGM and Meyer, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce, knowingly or recklessly employed a device, scheme, or artifice to defraud advisory clients.

136. By engaging in the conduct described above, MGM and Meyer violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 206(1) of the Advisers Act, 15 U.S.C. § 80b-6(1).

## SECOND CLAIM FOR RELIEF

### Violations of Sections 206(2) of the Advisers Act
### (All Defendants)

137. The Commission realleges and incorporates by reference paragraphs 1 through 132 above.

138. At all relevant times, MGM and Meyer were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11). In the Relevant Period, MGM and Meyer were in the business of providing investment advice concerning securities for compensation.

139. By engaging in the conduct described above, MGM and Meyer, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce, knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business, which operated as a fraud or deceit upon advisory clients.

140. By engaging in the conduct described above, Defendants MGM and Meyer violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Section 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(2).

## THIRD CLAIM FOR RELIEF

**Violations of Advisers Act Section 206(4) and Rule 206(4)-8(a)(1) and 8(a)(2) thereunder (All Defendants)**

141. The Commission realleges and incorporates by reference paragraphs 1 through 132 above.

142. At all relevant times, MGM and Meyer were "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11) to a pooled investment vehicle, as defined in Rule 206(4)-8(b) [17 C.F.R. § 275.206(4)-8(b)]. In the Relevant Period, MGM and Meyer were in the business of providing investment advice concerning securities for compensation.

143. Starship VI, the Liquidated SpaceX Funds, both iterations of MGP I, and Starship X were "pooled investment vehicles" within the meaning of Rule 206(4)-8(b) of the Advisers Act, 17 C.F.R. § 275.206(4)-8(b).

144. MGM and Meyer, by engaging in the conduct alleged herein, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, knowingly, recklessly, or negligently:

(a) made one or more untrue statements of material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle; and/or

(b) engaged in one or more acts, practices, or courses of business that were fraudulent, deceptive, or manipulative, with respect to any investor or prospective investor in the pooled investment vehicle.

145. By engaging in the conduct described above, Defendants MGM and Meyer violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Rule 206(4)-8 of the Advisers Act, 17 C.F.R. § 275.206(4)-8.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Defendants MGM and Meyer committed the alleged violations.

**II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants MGM and Meyer and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 206(1), 206(2), and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4), and Rule 206(4)-8 thereunder.

**III.**

Order Defendants MGM and Meyer, on a joint and several basis, to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, pursuant to Securities Exchange Act of 1934 (“Exchange Act”) Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

**IV.**

Order Defendants MGM and Meyer to pay civil penalties pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

**V.**

Enter a permanent injunction, pursuant to Section 21(d)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)(5)] and Section 209(d) of the Advisers Act [15 U.S.C. § 80b-9(d)], restraining and enjoining Meyer from directly or indirectly, acting as or being associated with any broker, dealer, or investment adviser. For purposes of this paragraph: (i) a person is associated with a broker or dealer if such person is a partner, officer, director, or branch manager of such broker or dealer (or occupies a similar status or performs similar functions), directly or indirectly controls, is controlled by, or is under common control with such broker or dealer, or is an employee of such broker or dealer; and (ii), a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

**VII.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## JURY DEMAND

The Commission demands a trial by jury as to all claims so triable.

Dated: September 30, 2026

Respectfully submitted,

/s/ *Anna O. Area*
Anna O. Area
Application for Admission *pro hac vice* pending
Senior Trial Counsel
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, DC 20549
Telephone: (202) 551-6417
Email: areaa@sec.gov

*Attorney for Plaintiff*

Of Counsel
Victoria Bohannan
Heather A. Hosmer